**IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **ANDREW CONLEY,** ) | |
| D.O.C. No. 218096, ) | |
| ) | |
| Petitioner, ) | Case No. 4:23-cv-74 |
| ) | |
| v. ) | |
| ) | |
| **DENNIS REAGLE**, ) | |
| ) | |
| Warden, ) | |
| Pendleton Correctional Facility ) | |
| ) | |
| Respondent. ) | |

**Verified Petition for Writ of Habeas Corpus
under 28 U.S.C. §§ 2241 & 2254**

The Petitioner, Andrew Conley, now comes before the Court with his Verified Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241(a) & (c) and 28 U.S.C. § 2254(a). (Section 2241(a) is a grant of jurisdiction; section 2254(a) is a limitation on jurisdiction.) For the reasons that follow, Andrew is entitled to a writ of habeas corpus conditioned on either a trial or a new sentencing hearing.

**Introduction**

Andrew Conley killed his brother, Conner, in November 2009 when Andrew was seventeen and Conner was ten. The State sought a sentence for Andrew of life without the possibility of parole, and that is what the trial judge imposed after Andrew pled guilty without a plea agreement.

In Andrew's direct appeal, the Indiana Supreme Court said, "The heinous facts of this crime are difficult to comprehend." In fact, they can be comprehended. The evidence was unequivocal: Andrew was—and had

been for some time—seriously mentally ill at the time Conner was killed. The state courts have repeatedly ignored Andrew's serious mental illness, because Andrew was found "criminally responsible" as part of competency and sanity evaluations, and because he was found to have an above-average verbal I.Q.

After both mis-advice and terrible advice by his lawyers, Andrew pled guilty to the murder without any plea agreement and thereby forwent being able to make his case against a life sentence to a jury. And after Andrew had pled guilty, Andrew's lawyers almost immediately went into a sentencing hearing for which they were not ready, relying principally on competency and sanity evaluations not prepared for a sentencing mitigation case and without the available witnesses to make Andrew's sentencing case and to rebut the State's.

### Andrew's Claims

Andrew brings to this Court multiple claims of trial ineffective assistance, including a claim that his lawyers were cumulatively ineffective. He also brings a claim that his guilty plea was not knowing, intelligent and voluntary.

### The State Appellate Decisions

There are three reported state-court appellate decisions involved in this case. The first of the three appellate decisions is *Conley v. State* ("*Conley I*"), 972 N.E.2d 864 (Ind. 2012), *reh'g denied*, Andrew's direct appeal to the Indiana Supreme Court. The second is *Conley v. State*, ("*Conley II*"), 164 N.E.3d 787 (Ind. Ct. App. 2021), *trans. granted, vacated, and summarily aff'd in part by* 183 N.E.3d 787 (Ind. 2022), *reh'g denied*. *Conley II* was Andrew's post-conviction appeal to the Indiana Court Appeals, which reversed the denial of post-conviction relief for Andrew's ineffective assistance claims. And the third decision, as indicated by the

citation form of *Conley II*, was the Indiana Supreme Court's decision on transfer, vacating and summarily affirming, in apart, *Conley II*: *Conley v. State* ("*Conley III*"), 183 N.E.3d 787 (Ind. 2022), *reh'g denied. Conley III* affirmed the denial of post-conviction relief.

1.  **Andrew's petition is being filed within a year of his judgment becoming final as permitted by 28 U.S.C. § 2244(d)(1)(A).**

Andrew has until Monday, May 8, 2023, to file his habeas petition, which he is doing with this petition. The calculation of the one-year deadline for filing the petition is as follows.

After Andrew had pled guilty to murder and been sentenced to life without parole in prison, he pursued a direct appeal. After affirming Andrew's sentence, the Indiana Supreme Court denied rehearing on October 22, 2012.

The one-year statute of limitations did not begin until Andrew's time for seeking further direct review had passed in the United States Supreme Court. § 2244(d)(1)(A); *e.g.*, *Lawrence v. Florida*, 549 U.S. 327, 333 (2007). That was ninety days after the denial of rehearing by the Indiana Supreme Court in Andrew's direct appeal. S. Ct. Rule 13.1.

Ninety days after October 22, 2012, the day the Indiana Supreme Court denied rehearing, was Sunday, January 20, 2013. Because January 20, 2013, was a Sunday, Andrew had until Monday, January 21, 2013, to file a petition for a writ of certiorari. S. Ct. Rule 30.1.

Andrew's one-year statute of limitations therefore began to run on Monday, January 21, 2013.

On February 19, 2013, Andrew properly filed a state post-conviction petition. At that point, 29 days of the one year had passed, leaving 336 days. Also at that point, with the proper filing of Andrew's state post-conviction petition, the statute of limitations stopped running. 28 U.S.C. § 2244(d)(2); *e.g.*, *Holland v. Florida*, 560 U.S. 631, 636 (2010).

Andrew's state post-conviction litigation ended on June 6, 2022, when the Indiana Supreme Court denied rehearing after its decision affirming the denial of state post-conviction relief. At that point, the statute of limitations began again to run.

The time remaining for Andrew to file his petition after the denial of rehearing by the Indiana Supreme Court in his post-conviction appeal was 336 days. Monday, May 8, 2023, is 336 days after June 6, 2022, and the deadline for Andrew to file this petition.

**2.    Venue is proper in this Court under 28 U.S.C. § 2241(d).**

Andrew was convicted and sentenced in Ohio Circuit Court in Ohio County, Indiana; he is imprisoned at the Pendleton Correctional Facility in Pendleton, Indiana, which is in Madison County, Indiana. Both Ohio and Madison Counties are in this district, so venue is proper in this district. § 2241(d) ("[T]the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him . . . .").

**3.    This is a Rule 2(c) petition.**

Rule 2(c) of the Rules Governing Section 2254 Cases only requires that a petition specify the grounds for relief, the facts supporting each ground, and the relief requested. Rule(2)(c)(1)–(3). The rule does not require any legal argument. Andrew therefore sets out below, first, the facts giving rise to his claims, and then his claims, themselves. The Conclusion at the end contains his request for relief. Andrew reserves his legal arguments for his reply, as the Rules Governing Section 2254 Cases permit.

4. **The Facts**

a.   The Historical Facts of the Crime

The Court must presume correct the facts as found by the state courts, 28 U.S.C. § 2254(e); the focus of habeas review is on the particular reasons, factual and legal, the last state-court decision gave for rejecting a petitioner's federal claims. *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018). Andrew therefore begins with the recitation of the historical facts of the crime by *Conley III*, the last state court decision rejecting Andrew's trial ineffective assistance claims. *Conley III*, though, takes those entirely from *Conley I*, the Indiana Supreme Court's decision in Andrew's direct appeal.

> Conley was [a] seventeen-and-a-half-year-old when he murdered his ten-year-old brother, Conner. The murder took place between 8:30 p.m. and 10:00 p.m. His mother and adoptive father were at work that evening until the early morning hours. As was not uncommon, Conley was responsible for watching Conner that evening. Conley's mother told him he would have to find a babysitter for Conner if he wished to go out with his friends.

> Conley wanted to go out that evening, so Conley drove Conner to their grandmother's house in Rising Sun, Indiana, but she was not home. He next asked his uncle to watch Conner but was told no. After they returned home, Conley and Conner began wrestling.

>  At some point, Conley got behind his brother and choked him in a headlock with his arm until Conner passed out. Conner was bleeding from the nose and mouth. Conner was still breathing. Conley drug [sic] Conner into the kitchen, retrieved a pair of gloves, and continued to choke Conner from the front, around his throat. Conley choked Conner for approximately twenty minutes total.

> Conley next got a plastic bag from a drawer in the kitchen and placed it over Conner's head. Conley used black electrical tape to secure the bag by wrapping the tape around Conner's head. Conner was still alive. In fact, Conner's last words were "Andrew stop."

Conley then drug [sic] Conner's body to the steps that lead to the basement, drug him down the steps by his feet, across the floor, and outside the home. Conley slammed Conner's head on the concrete multiple times to ensure Conner was dead and then placed his body in the trunk of his car. Conley cleaned himself up and put on new clothes. He put the bloody clothes in his closet and hid the bloody gloves in a chair.

Conley next drove to his girlfriend's house. While there they watched a movie, and he gave her a "promise ring." Conley's girlfriend testified at the sentencing hearing that Conley was "[h]appier than I'd seen him in a long time." Conley spent two hours at his girlfriend's house, while Conner's body remained in the trunk of the car. After leaving his girlfriend's house, Conley drove to an area behind the Rising Sun Middle School. Conley decided to drag Conner's body into the woods and covered the body with sticks and vegetation.

Conley returned home during the early morning hours on Sunday the 29th when no one was home. He cleaned up the blood in the house. When his father returned home around 2:30 a.m., Conley was acting normal. Conley said that Conner was at his grandmother's house and Conley also asked his father for some condoms.

Conley's mother arrived home around 5:45 a.m., and Conley and his mother had popcorn, watched a movie together, and cracked jokes back and forth. His mother fell asleep. On two occasions that early morning, Conley went into his father's bedroom and stood over him with a knife. Conley said he had the intent to kill his father, but he decided not to.

Later that same Sunday, Conley watched football with his father. Following football, Conley left home and drove to the park in Rising Sun where Conner's body had been discarded, but he never went to the actual location. Instead, Conley spoke to two friends and told [them] that he had killed Conner. Thereafter, around 8:00 p.m., Conley drove his car to the Rising Sun Police

> Department and voluntarily reported he "accidentally killed his
> brother" or that he "believed" he had killed his brother.

*Conley III*, 183 N.E.3d at 280–81 (quoting *Conley I*, 972 N.E.2d at 869–70)
(indentation for quotation omitted). These events described began on
Saturday, November 28, 2009, and continued into the following day,
Sunday, November 29th. *Conley I*, 972 N.E.2d at 869.

b.   Andrew's Confession to the Police

In fact, Andrew fully confessed to having killed his brother and led
the police to his brother's body and all the evidence of what had happened.

c.   The Charges and Compressed Scheduling

On December 3, 2009, under Indiana Code § 35-42-1-1, the State
charged Andrew as an adult with murder for the knowing killing of
Conner. Andrew's trial was originally scheduled to begin on May 2, 2010.
Andrew's lawyer, Gary Sorge, requested an evaluation of both whether
Andrew was competent to stand trial and whether Andrew had been
legally insane at the time Conner was killed. Mr. Sorge was also
discussing with the State the possibility of a plea agreement. In April
2010, Andrew's request, the trial judge continued the trial to September 7,
2010.

On July 2, 2010, the State filed its notice of intent to seek a sentence
of life without parole and alleged, as a single statutory aggravating
circumstance under Indiana Code § 35-50-2-9(b)(12), that Conner was
under the age of twelve when he was killed. Two weeks later, on July 16,
2012, and at Mr. Sorge's request, the trial court appointed John Watson to
act as co-counsel with Mr. Sorge. Mr. Watson filed his appearance for
Andrew on July 19, 2010.

With the trial scheduled less than a month away, on August 12, 2010,
Andrew's lawyers filed a request for permission to hire an investigator;

the trial judge granted that request the same day. A week later, on August 19, 2010, Andrew's lawyers requested that the trial date be continued; the trial judge also granted that request the same day, moving the trial date a mere six days, from September 7 to September 13, 2010.

On August 25, 2010, the trial court held a hearing on Andrew's motion to suppress his statement to the police and the State's motion to prevent Andrew from presenting an insanity defense. Memoranda related to both motions were ordered submitted by August 31, 2010, with responses due by September 2, 2010.

There was, then, a lot going on in 73 days between July 2nd, when the State filed notice of its intent to seek a life sentence, and the September 13th trial date, not set until August 19th. To summarize:

- Less than two months before trial, Mr. Watson appeared for Andrew as co-counsel on July 19th.

- Less than a month before trial, Andrew's lawyers asked for and obtained permission to hire an investigator on August 12th.

- Three weeks before the final trial date of September 13th, on August 25th, Andrew's lawyers appeared at the hearing on Andrew's motion to suppress his statements to the police and the State's motion to prevent Andrew from presenting an insanity defense.

- Presumably, in the very limited time before the hearing on those motions, Andrew's lawyers had to prepare for the hearing.

- After the hearing on the motions, Andrew's lawyers had six days, until August 31st, to prepare their memoranda about those motions.

- Thereafter, Andrew's lawyers had two days, until September 2nd, to prepare their responses to the State's memoranda.

But that is not the end of the story.

- On September 2nd, with less than two weeks until trial, the State filed a motion in limine.

- The next day, September 3rd, the State filed a motion to permit the jury to view the crime scene.

- On September 7th, 6 days before trial, the trial court held a hearing on those two motions; at the hearing, Andrew's lawyers made their own motion in limine, which the trial court ordered them to file in writing.

- The very next day, September 8th, 5 days before trial, the State was still doing its own discovery by filing its notice of deposition of Andrew's parents.

- And the same day, September 8th, the State filed a supplemental discovery answer.

Finally, all of Andrew's lawyers' preparation occurred in this compressed time without knowing the result of their motion to suppress Andrew's statements to the police or the State's motion to prevent Andrew from presenting an insanity defense. The trial court denied both, but not until the day the trial was to begin, September 13th.

For indigent defendants, Indiana Criminal Rule 24(B) requires that two lawyers be appointed and that those lawyers meet certain minimum standards and requirements when the State seeks the ultimate sentence, death. It does not require that appointed lawyers meet those standards and requirements when the State merely seeks a sentence of life without the possibility of parole.

And this is so even though, in Indiana, death and life cases are tried under the same standards with the same heightened degree of reliability required by the Eighth Amendment. *Treadway v. State*, 924 N.E.2d 621, (2010) ("[A] sentence of life without parole is imposed under the same

standards and is subject to the same requirements as a capital sentence . . . ." (Citation omitted).). The Indiana Supreme Court, itself, explicitly recognized as much in *Conley III*: "A sentence of life without parole (LWOP) is subject to the same statutory standards and requirements as the death penalty. *Krempetz v. State*, 872 N.E.2d 605, 613 (Ind. 2007)." *Conley III*, 972 N.E.2d at 871. And Criminal Rule 24(B) does not require any special qualifications even when, as in Andrew's case, a life sentence *is* the ultimate sentence. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."); *Miller v. Alabama*, 567 U.S. 460, 475 (2012) (commenting on the Court's view in *Graham v. Florida*, 560 U.S. 48 (2010), that a life sentence is the "ultimate penalty for juveniles" and "akin to the death penalty").

Andrew had the two lawyers Criminal Rule 24(B) requires in death cases, but only for less than 2 months of the 73 days between July 2nd, when Andrew's prosecution became subject to capital standards, and September 13th. Of those 73 days, Andrew had an investigator for less than a month. Just as a factual matter, the *Conley II* court summed all this up perhaps best:

> [T]he sentencing hearing took place only two days after Conley pleaded guilty without a plea agreement, and defense counsel seemed unprepared for the State's extensive presentation and failed to grasp the importance of an LWOP sentencing hearing. At the PCR hearing, defense counsel testified they thought the sentencing hearing "would be more along the lines of a typical sentencing hearing where the prosecution would basically present a prima facie case and put on their aggravators." PCR Tr. Vol. II p. 62. The State, however, presented extensive evidence regarding the nature of the offense and Conley's mental health. **This testimony demonstrates that**

**the defense was not qualified to handle LWOP cases involving a juvenile.**

*Conley II*, 164 N.E.3d at 809–10 (emphasis added).

d. Andrew's Guilty Plea

Jury selection was to begin on September 13, 2010. But rather than proceeding with jury selection, Andrew pleaded guilty without any plea agreement. The cursory facts as found by *Conley II* regarding the circumstances of Andrew's guilty plea are the following:

> The record of the guilty plea hearing and the sentencing hearing reflect that trial counsel and the sentencing court advised Conley of his right to a jury trial and his right to trial by jury during the sentencing phase. See Direct Appeal Tr. Vol. I pp. 247–48; see Direct Appeal Tr. Vol. II p. 253. At the evidentiary hearing, Attorneys Sorge and Watson testified that: (1) Conley insisted on pleading guilty and forgoing a jury trial; (2) trial counsel made the strategic decision that entry of a guilty plea was Conley's best chance at avoiding a sentence of LWOP; and (3) trial counsel advised Conley accordingly.

*Conley II*, 164 N.E.3d at 812.[1] But that is not nearly the complete story.

It is certainly true that Andrew had told Mr. Sorge when they first met that he wanted to plead guilty. In fact, Andrew asked for the death penalty.

But Andrew was mis-advised about the consequences of his plea in at least two respects. First, in addition to wanting to accept responsibility,

---

[1] In *Conley III*, the Indiana Supreme Court summarily affirmed the *Conley II* decision by the Indiana Court of Appeals with respect to its affirmance of Andrew's claims that his guilty plea was not knowing, intelligent and voluntary and that his lawyers had been ineffective in advising him to plead guilty. *Conley III*, 183 N.E.3d at 282 n.1. That portion of *Conley II*, then was not vacated and remains Court of Appeals authority. Ind. Appellate Rule 58(A)(2). Presumably, then, the facts in *Conley II* supporting its decision on these issues are subject to the presumption of correctness in 28 U.S.C. § 2253(e)(1).

Andrew wanted to plead guilty to spare others the stress of a trial. Instead, the sentencing hearing lasted five days and included extensive evidence regarding the facts of the crime—evidence well beyond the State's single alleged aggravator, Conner's age. Mr. Sorge had told Andrew he thought a life sentence—or even a maximum term of years— unlikely because he believed the available mitigation evidence outweighed the State's single alleged aggravating circumstance. Both of Andrew's lawyers expected a typical sentencing hearing; it is unsurprising, then, that both were surprised by how the hearing progressed.

Additionally, in advising Andrew to plead guilty, Andrew's lawyers were completely unaware of the tactic of "frontloading" mitigation, well-known in the capital defense literature and among capital defense lawyers. "Frontloading is a practice whereby defense advocates conduct wide-ranging sentencing investigations in search of information that can be strategically presented during the guilt-innocence phase in a way that validates, and ideally reinforces, arguments presented at the penalty hearing." Jesse Cheng, *Frontloading Mitigation: the "Law" and the "Human" in Death Penalty Defense*, 35 Law and Social Inquiry 39, 53 (2010).

Second, it is true that the trial judge told Andrew that he was waiving his right to a sentencing jury by pleading guilty. But on that point, Andrew's lawyers gave Andrew conflicting information. They told him that he might have a constitutional right to a sentencing jury notwithstanding his guilty plea.

Additionally, in advising Andrew of the rights he was waiving by pleading guilty, the trial judge did *not* tell Andrew that he would have had all the rights before a sentencing jury as he would have had before the jury during the guilt phase of a trial.

In the post-conviction proceedings, Andrew said he would not have pled guilty if that were the only means of possibly seeing his family again. Post-Conviction Ex. A., 25. He also said he would have gone to trial before a jury had he understood that would have been a means to more effectively present his mitigation case. Andrew was especially unhappy the tactics chosen by his lawyers permitted the State to minimize his suicide attempts and failed to defend the fact of his serious self-harming behavior. *Id.* at 26, 39.

e.    Andrew's Sentencing Hearing

The *Conley II* decision by the Indiana Court of Appeals accurately recites, in part, what happened at Andrew's sentencing hearing, begun the Monday after he had pled guilty on a Thursday. As facts in support of his petition, Andrew incorporates by reference that section of *Conley II*. See *id.*, 164 N.E.3d at 794–97 ("II. Sentencing Hearing").[2] Briefly, though, Andrew's lawyers failed at the sentencing hearing in multiple respects.

*No Evidence about Brain Development in Children*

Andrews lawyers presented no evidence about brain development in children as it relates to their immaturity and culpability; they failed to even mention *Roper* or *Graham* either during the sentencing hearing or in their sentencing memorandum. In their post-conviction testimony, Andrew's lawyers had no explanation for the omission.

---

[2] By granting transfer, the Indiana Supreme Court vacated *Conley II*. At the same time, *Conley III* summarily affirmed *Conley II* in part. It is unclear whether these facts about the sentencing hearing, as found by the Indiana Court of Appeals in *Conley II*, are entitled to § 2254(e)(1)'s presumption of correctness. But it does not matter. The facts about the sentencing hearing in *Conley II* are correct and supported by citations to the state-court record. And Andrew will not be making any argument under § 2254(d)(2) with respect to the factual recitation by *Conley II* regarding the sentencing hearing.

Both *Roper* and *Graham* rely in great measure on the science of brain development in children. *Roper* was decided in 2005; *Graham* was decided a few months before Andrew's sentencing hearing. The science—and its importance in the most serious prosecutions of children—was not a secret.

*No Pathologist to Rebut Dr. Hawley's Testimony*

Despite having notice that Dr. Dean Hawley, a pathologist, would be testifying for the State, Andrew's lawyers did not consult with or obtain the testimony of their own pathologist to rebut Dr. Hawley's testimony. Dr. Hawley's testimony permitted the State to argue that Conner was still alive in the trunk of Andrew's car while Andrew was at his girlfriend's house: "And the evidence suggests from Dr. Hawley, that [Conner] was still not dead as he sat in [Andrew's] trunk while [Andrew] went and gave his girlfriend a friendship ring." Trial Tr. 995. And in the end, Dr. Hawley's unrebutted testimony permitted the trial judge to find, as a matter of fact, that "the Defendant performed four separate violent acts on his brother, Conner, over a considerable period of time" and that "[t]his crime did not occur as a single event immediately causing death." Trial Tr. 1032.

Andrew's post-conviction lawyers presented the testimony of pathologist Dr. George Nichols. Dr. Nichols testified unequivocally that there was no evidence to suggest Conner had survived being strangled. Conner had died, he said of a single, fatal choking incident. Post-Conviction Tr., Vol. 2, 97. The State presented *no* post-conviction testimony to rebut Dr. Nichols' opinion that Dr. Hawley was, at best, mistaken.

*The Failure to Adequately Cross-Examine Dr. Daum*

As the Indiana Court of Appeals found in *Conley II*, Dr. James Daum "testified extensively on rebuttal that Conley possessed the characteristics

of a psychopath even though Dr. Daum had never interviewed or examined Conley." 164 N.E. 3d at 811. And, also as the *Conley II* court found, Dr. Daum's opinion about Andrew being a psychopath was the "centerpiece" of the State's case rebutting the evidence Andrew was seriously mentally ill. *Id.* From the State's questioning of Dr. Daum:



| | | |
|---|---|---|
| 16 | Q. | And do you agree with Dr. Connor's assessment that he |
| 17 | | suffers from schizoaffective disorder? |
| 18 | A. | Where I run into difficulties, I do not have his test results and, |
| 19 | | um, again, I don't have the benefit of an interview. But based |
| 20 | | on what information I had, I don't agree. |
| 21 | Q. | You think a more plausible explanation to the date that Dr. |
| 22 | | Connor - - or in this case, is that there's evidence of a |
| 23 | | psychopathic personality? |
| 24 | A. | Correct. |
| 25 | | |
| | | 980 |

Trial Tr. 980 (highlighting added). Andrew's lawyers had no answer for this. And, as noted already, they were apparently unaware of *Roper*, in which the Supreme Court pointed out:

> It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. **As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy**, and which is characterized by callousness, cynicism, and contempt for the feelings, rights, and

suffering of others. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701–706 (4th ed. text rev. 2000).

543 U.S. at 573 (some citations omitted) (emphasis added).

*The Failure to Call Witnesses Who Knew or were Close to Andrew*

There were fourteen witnesses—teachers, friends, and family—Andrew's trial lawyers failed to call in support of their mitigation case for Andrew. Andrew's investigator, even after his necessarily only brief involvement, told Andrew's lawyers: "[The case] is a very complex matter. It appears [Andrew] suffered many years from physical and emotional abuse." Post-Conviction Ex. 9.

The testimony forgone by Andrew's lawyers at the sentencing hearing and developed at that post-conviction hearing was the following.

- LeAnn Craig, a school guidance counselor at Andrew's high school was concerned about Andrew's withdrawal from school in November 2009. Craig said Andrew was a "good student on track to graduate." Post-Conviction Tr., Vol. 2, 150. As a mandatory reporter of abuse, Craig would have alerted Child Protective Services of Andrew's self-harm had Andrew's mother not assured her that appropriate, immediate action was being taken. *Id.* at 152.

- Former teachers, who had known Andrew for years, described a bright, quiet, and tender individual, rather than the cold-blooded killer described by the police who interviewed Andrew for hours shortly after Conner's death, while Andrew was clearly suffering a mental health crisis. Post-Conviction Tr., Vol. 2, 162. 283, 236; Vol. 3, 110.

- From their knowledge of Andrew, eight teachers were completely surprised to learn what Andrew had done. *Id.*, Vol. 2, 158, 164, 170, 187, 238; Vol. 3, 18, 111, 117.

- Darren Monhollen taught accounting and was alarmed that Andrew, an A student, deliberately failed a test twice. This was so out of character for Andrew it concerned Mr. Monhollen, and he alerted the school counselor, Ms. Craig. *Id.*, Vol. 3, 113.

- Two other teachers, Kevin Wirsch and Kevin Smith, also testified about Andrew's decline in the fall of 2009. *Id.*, Vol. 2, 219, 234.

- Deirdre Aberts, Ashley Palaima, and Rachel Thomas, knew Andrew as kind, knew about his difficulties at home, and noticed his withdrawal, socially, and precipitous decline in the fall of 2009. *Id.*, Vol. 2, 178; Vol. 3, 9, Ex. 10: 10, 12–13, 34. Ms. Thomas actually testified for the State at Andrew's sentencing hearing. She said Andrew, before his withdrawal from school and one of his attempted suicides in early November 2009, told her he had been sexually abused by one of his step-fathers. Trial Tr. 890–92.

- Barbara Kemp, the mother of Jared Grever, a friend of Andrew's, noticed Andrew's depression and decline and was very concerned about Andrew's safety after a discussion they had had on Black Friday 2009, the day before Conner was killed. Post-Conviction Tr., Vol. 3, 211, 212.

- Beth Hurley, the mother of Andrew's friend Dylan and one of the people closes to Andrew, was actually subpoenaed by Andrew's lawyers to appear at Andrew's sentencing hearing. But, without explanation, they did not call her as a witness. *Id.*, Vol. 3, 223. Ms. Hurley knew Andrew's parents had wanted Andrew to withdraw from high school and to enlist in the military. Andrew did not want to withdraw from school, but his parents threatened to have Andrew and threatened to have him psychiatrically committed if he were to speak with a school guidance counselor. *Id.* at 216, 218. During the two weeks before Thanksgiving in 2009, while Andrew was working in her

restaurant, Ms. Hurley also noticed Andrew had been cutting himself and that the cuts were deep and should have required stitches. *Id.* at 216. Ms. Hurley also was aware that Andrew's mother strictly controlled Andrew's movements and cell-phone use; Ms. Hurley was concerned that Andrew's mother could not trust Andrew, on the one hand, but still expected Andrew to care for Conner, on the other. *Id.* at 218.

### *The Failure to Obtain and Present Andrew's Jail Records*

Andrew's lawyers failed to request and obtain Andrew's Dearborn and Switzerland County jail records. The records were readily available and contained a mental health screening that reflected that Andrew was reporting symptoms close in time to both the offense and his statements. Those records would have significantly corroborated the evidence about Andrew's mental health—evidence largely rejected by the trial judge in sentencing Andrew to life without parole.

### *The Failure to Call Jail Personnel as Witnesses*

Bert Allen, Shalon Stewart, LuAnn Schaefer, and Angela Splain were all jail personnel who supervised Andrew while he was in jail before his trial. Had they testified at Andrew's sentencing hearing, they would have said that Andrew was under constant monitoring because he was a danger to himself, though not to others. Post-Conviction Tr., Vol. 3, 86, 91, 101. They noticed scars from cuts Andrew had recently inflicted on himself. Though these injuries were healing and did not require immediate medical intervention when noticed, they were a source of alarm. Ms. Splain was a nurse, understood the seriousness of self-harm in children, and recognized the severity of the cuts. *Id.* at 82.

### *The State's Closing Argument about Credit Time—without Objection*

In addition to flooding the sentencing hearing with suggestions that Andrew was not mentally ill, but a psychopath, the State argued that a term of years was insufficient punishment for Andrew.

Indiana Code § 35-50-2-9(d) provides in part: "The court shall instruct the jury concerning the statutory penalties for murder and any other offenses for which the defendant was convicted, the potential for consecutive or concurrent sentencing, and the availability of good time credit and clemency." Taking advantage of this bit of statute, without objection by Andrew's lawyers, the State argued that a maximum 65-year term of years would, accounting for good-time credit and possible educational credit, result in Andrew spending a mere 28 years in prison. Trial Tr. 995. "Twenty-eight to thirty years is simply not enough for the murder of a ten-year old child under any circumstances." *Id*. Andrew's lawyers objected to none of this.

Finally, as he had been invited to do by the State in its closing argument in imposing a life sentence, the trial judge "considered the availability of good time credit as set forth in I.C. 35-50-2-9(d)." Trial Tr. 1035. And he did so while explicitly recognizing that, even having found the aggravating circumstance outweighed the mitigating circumstances, he could still impose a term of years. *Id*. at 1036.

f.   Andrew's Direct Appeal

In his direct appeal, Andrew raised, in the end, four issues. Two are relevant to this petition. First, Andrew argued that his life sentence violated the Eighth Amendment and the Indiana Constitution under a number of cases, including *Roper, Graham,* and *Miller v. Alabama*, 567 U.S. 460 (2012), the last of which had been decided while Andrew's direct appeal was pending. *Conley I* denied relief on this issue because: 1) *Roper* and *Graham* implicitly recognized that a life sentence for children does

not *per se* violate the Eighth Amendment, *Conley I*, 972 N.E.2d at 878; and 2) *Miller* only applied to mandatory life sentences for children. *Conley I*, 972 N.E.2d at 879.

Second, Andrew argued that the Indiana Supreme Court should convert his sentence to a term of years under Indiana Appellate Rule 7(B), which permits an Indiana appellate court to revise a sentence "where it is inappropriate in light of the nature of the offense and the character of the offender." *Conley I*, 972 N.E.2d at 876. In a 3-2 decision, the *Conley I* court declined to convert Andrew's sentence to a term of years. *Id.* at 877. Justices Rucker, in an opinion in which Justice Sullivan concurred, would have revised Andrew's sentence to a maximum 65-year term. *Id.* at 889 (Rucker, J., dissenting in part).

In a brief rehearing petition, Andrew pointed out to the Indiana Supreme Court that, on the same day it decided Andrew's case, it also decided *Castillo v. State*, 972 N.E.2d 864 (Ind. 2012). In *Castillo*, the court converted a life sentence to a maximum 65-year term for the murder of a two-year old. *Id.* at 461, 467. Ms. Castillo was not a child, herself, at the time of the murder for which she was convicted.

g.    The Post-Conviction Decisions

Andrew pursued state post-conviction relief on claims, as relevant to this petition, of trial ineffective assistance and that his guilty plea was not knowing, intelligent, and voluntary. The post-conviction trial court denied relief on all Andrew's claims.

In *Conley II*, the Indiana Court of Appeals reversed the denial of post-conviction relief. The *Conley II* court concluded that Andrew's trial lawyers had performed deficiently for: 1) failing to present any evidence about brain development in children; 2) failing to adequately challenge the State's evidence about Andrew's mental health; 3) failing, in particular, to

challenge Dr. Daum's testimony suggesting Andrew was a psychopath; 4) failing "to call witnesses that had known [Andrew] for most of his life and could testify regarding his circumstances at home and the significant decline of his mental health"; 4) failing "to properly challenge Dr. Hawley's testimony regarding possible sexual abuse of Conner and regarding Dr. Hawley's assertion that Conner lived for several hours after [Andrew's] assault on him." *Conley II*, 809–11. It further concluded that Andrew had been cumulatively prejudiced by these failures: "We conclude that Conley was prejudiced by trial counsel's failure to advance the prevailing mitigating theory of diminished juvenile culpability as taught in *Roper* and *Graham*, failure to fully investigate and present mitigating factors, and failure to effectively cross examine the State's expert witnesses." *Id.* at 811.

The State sought transfer to the Indiana Supreme Court, which that court granted. In *Conley III*, the Indiana Supreme Court concluded that Andrew's lawyers had not been ineffective. *Id.*, 183 N.E.3d at 280 ("We hold Conley did not receive ineffective assistance of counsel and affirm the post-conviction court.")

## Claims

1. **Andrew's trial lawyers were ineffective withing the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984), for each of the following instances of deficient performance, taken individually or cumulatively, before and at Andrew's sentencing hearing.**

   a. Advising—and mis-advising—Andrew to plead guilty.

   b. Failing to present any evidence about brain development in children as it related to Andrew's age, and to argue the lesser moral culpability of children as discussed in United States Supreme Court cases already decided at the time of Andrew's sentencing hearing.

c.   Failing obtain an expert and present expert testimony to rebut the State's expert, Dr. Hawley, regarding the facts of Conner's death.

d.   Failing to be prepared to and to actually challenge the State's expert testimony from Dr. Daum about Andrew's mental condition and health.

e.   Failing to obtain jail records and the testimony of jail personnel about Andrew that would have been highly relevant to rebut the State's sentencing case regarding Andrew's mental condition.

f.   Failing to call all or any of fourteen witnesses—teachers, friends, and family who knew or were close to Andrew and whose testimony would have substantially supported Andrew's mitigation case.

But for these instances of deficient performance, taken individually or cumulatively, there is a reasonable probability either: 1) Andrew would not have been sentenced to life without the possibility of parole in the first instance; or 2) a life sentence imposed below would have been converted to a term of years in Andrew's direct appeal.

2.   **Under *Johnson v. Zerbst*, 304 U.S. 458 (1938), and its progeny, Andrew's guilty plea, about the consequences of which he was mis-advised and for which he got nothing while surrendering a lot, was not knowing, intelligent, and voluntary.**

## Conclusion

For the foregoing reasons, Andrew respectfully requests that the Court issue a writ of habeas corpus conditioned on a trial or a new sentencing hearing. Andrew also requests any other appropriate relief.

Respectfully submitted,

/s  Michael K. Ausbrook
Indiana Attorney No. 17223-53

P.O. Box 1554
Bloomington, IN 47402

Telephone: 812.322.3218
Email: mausbrook@gmail.com

Counsel for Andrew Conley,
Petitioner

In accordance with Rule 2(c)(5) of the Rules Governing Section 2254 Cases, I affirm under penalty for perjury that the foregoing representations are true.

/s  Michael K. Ausbrook
Indiana Attorney No. 17223-53